UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

WESTERN MORTGAGE & REALTY
CO., a Washington corporation,

                  Plaintiff,

      v.

KEYBANK NATIONAL
ASSOCIATION, a national banking
association and KEYCORP CAPITAL,
INC., an Ohio corporation,

                Defendants.

Case No. 1:13-cv-00216-EJL-REB

**MEORANDUM DECISION
AND ORDER**

Defendants KeyBank National Association, NBA and Keycorp Capital, Inc.
(collectively "KeyBank") sold to Plaintiff Western Mortgage & Realty Co. ("Western") a
security interest in Nature's Best Produce Inc.'s ("Nature's Best") potential recovery
from a commercial tort claim.  However, KeyBank had released Nature's Best from its
obligations prior to selling the security interest to Western.  Western sued KeyBank for
breach of warranty, breach of the implied covenant of good faith and fair dealing, and
fraud.  Western has moved for partial summary judgment (1) holding KeyBank liable on
the breach of warranty claim, and (2) declaring that Western owns outright two
assignments in another party's recovery from the same commercial tort claim.  KeyBank
defended against these motions and moved for summary judgment on the grounds that (1)

1

Western waived the warranties that form the basis of its contract and fraud claims and (2) that it cannot prove damages.  Western also moved in limine to exclude the testimony of KeyBank's damages expert. KeyBank sought leave to file a second motion for summary judgment regarding the statute of limitations  on the contract claims and the Court granted the motion.

Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

## BACKGROUND

For many years, Steve and Roy Young owned several farms and various affiliated businesses in southeast Idaho.  One of the affiliates was Nature's Best.

Around the year 2000, the U.S. Bureau of Land Management sprayed the land it managed with an herbal pesticide called "Oust," which was manufactured by DuPont. Wind caused Oust and Oust laden soil to drift from the BLM land onto, among others, the Youngs' farms, killing or severely damaging the Youngs' crops.  In 2003, the Youngs and their businesses, including Nature's Best, sued the United States, DuPont, and other entities alleging they sustained $117 million in damages (the "Oust Litigation").

As a result of the Oust incident, the Youngs began experiencing financial troubles. In an effort to keep their farm and businesses afloat, the Youngs and their businesses

borrowed money from three main banks.   In 2003, the Youngs borrowed approximately $12.3 million from North West Farm Credit Services ("NWFCS").  In 2004, the Youngs borrowed approximately $12 million from Metropolitan Life Insurance Company ("MetLife").  Finally, in 2004 and 2005, the Youngs took out several loans from KeyBank with a combined face value of approximately $23.5 million ("KeyBank loans"). As security for the KeyBank loans, the Youngs and Nature's Best pledged any potential recovery from the Oust Litigation (also referred to as the "Oust Proceeds").  Dkt. 75-9.

Around this time, Steve and Roy Young divided their ownership of their various businesses.  Steve Young took ownership of the farms and farming businesses (the "Young Group").  Roy Young took Nature's Best.  As part of this process, Roy Young began working with KeyBank to have him and Nature's Best released from its obligations under the KeyBank loans.  On April 19, 2006, KeyBank and Roy Young finalized the release (the "2006 Release").  Dkt. 75-13.  The 2006 Release included the security interest Nature's Best had given KeyBank in the Oust Proceeds. On June 19, 2006, KeyBank publicly filed a UCC lien termination, terminating the earlier UCC financing statement covering its security interest in Nature's Best's claim to proceeds from the Oust Litigation.

Western was formed in 1991 by Tim Tippett and Frank Tiegs to purchase various forms of performing and non-performing loan accounts from creditors.  In early 2006, Western began working to gain control over Steve Young's farms via the non-performing loans as well as acquiring the farming operations from the Young Group. Western

ultimately purchased all of the non-performing loans held by NWFCS, MetLife, and KeyBank and related security interests.

In 2006, Western also began negotiating directly with Steve Young to acquire the Young Group's assets.  During those negotiations, Steve Young and his son sent Tiegs and Tippett, officers of Western, several emails that referenced the split between Steve and Roy Young.  The first email informed Western that "Roy [was] in the process of making a deal with KeyBank to be released from obligation personally and also to get Natures [sic] Best Produce (Fresh Pack Shed) released from cross collateralization [sic] also."  Dkt. 61-1 at 57.  The second two emails, sent in late April 2006, made reference to Roy's change in status.  Dkt. 61-1, at 62 ("Roy has got his paper work done so he is no longer liable to the banks on the farm debt or involved in the ownership of the our [sic] land."); *id.* at 65 (under an agenda header entitled "Closing Land Deals" was written "Roy Young out of everything"). Tippett and Tiegs do not dispute they received the emails. Tippett admits he knew Roy Young had sole ownership of Nature's Best in 2006. Tippett Depo, Dkt. 142-1, p. 5 (93:13-18). Western was not trying to purchase the assets of Roy Young, just the farming assets/operations of Steve Young and the Young Group.

Western was also negotiating with KeyBank to purchase the KeyBank loans and finalized the terms of the purchase on May 10, 2007.  It is unclear whether or not KeyBank was aware of the side negotiations for the farming operations between Western and Steve Young. The agreement between Western and KeyBank was memorialized in a "Loan Sale Agreement" (or "LSA") which closed on May 23, 2007.  Dkt. 57-9.  Among

the assets that Western agreed to purchase was KeyBank's security interest in the Young Group's and Nature's Best's interest in the Oust Proceeds.  KeyBank warranted it had good title to the assigned assets, and that it had not previously assigned its interests in the assets.  *Id.* § 4.1.3.  The LSA further stated that "[t]he representations, warranties, covenants, agreements, and indemnities of the parties . . . shall survive [c]losing."  *Id.* §10.

The LSA also indicated that Western was a sophisticated buyer with respect to the LSA and "has made such examination, review, and investigation of the facts and circumstances necessary to evaluate the Assigned Rights and Assumed Obligations as it has deemed necessary or appropriate." *Id.* § 4.2.4. Western was provided with a listing of all the UCC financing statements related to the security interests being purchased. According to Tippett, Western did not verify the status of *any* of the UCC financing statements it was acquiring to ensure they were valid in May 2007. Tippett Depo, Dkt. 62, p. 53 -54 (167:17-25; 168:1-5; 169: 1-13). Tippett is aware of how to verify the status of UCC financing statements and lien terminations that are publicly filed.  *Id.*, p. 53-54, (168:15-25; 169:1-13).

In exchange, Western agreed to pay $5.75 million at closing and an amount equal to fifty percent of the net Oust Litigation proceeds that Western might recover in the future.  On August 3, 2010, the parties executed an Amendment to the LSA which replaced the future recovery provision referred to as the Deferred Balance owed to KeyBank with a fixed payment of $1.75 million by Western to KeyBank.

5

Under the LSA, KeyBank was required to deliver at closing those documents that were necessary to transfer ownership of the assets. *Id.* §1.2. The parties also agreed that these documents would be "legal, valid, and binding agreements of [the parties] enforceable against [the parties] according to their respective terms." *Id.* §§ 4.1.2, 4.2.2.

As part of closing, Western and KeyBank signed a document entitled "Assignment of Security Agreement, Control Agreement, and Assignment of Commercial Tort Claims without Recourse and Without Warranty" (the "Oust Assignment"). Dkt. 57-10. As the name suggested, the Oust Assignment purported to transfer ownership of KeyBank's security interests in the Oust Litigation. In contrast to the LSA, however, the Oust Assignment stated that KeyBank made the assignment to Western "without warranty and without recourse." *Id.* The Oust Assignment did not affect the warranties Western had made in the LSA. The Oust Assignment also contained a standard merger clause. *Id.* at 3.

In early August 2007, Western and Steve Young negotiated a "global settlement." Most of the terms of the settlement were detailed in a Letter of Understanding ("LOU"). According to the LOU, Steve Young transferred title to his farms, farming equipment, and, "by way of a Partial Assignment of Right, Title and Interest In and To "OUST" Claim," a fifty percent ownership interest in Steve Young's and the Young Group's Oust claim. *LOU*, dkt. 61-2, at 48; *2d Partial Assignment*, dkt. 75-16, at 2. Four months earlier, Steve Young had executed another partial assignment that gave Western a fifty percent ownership interest in the Oust Litigation. *1st Partial Assignment*, dkt. 75-15, at

2.  In exchange, Western agreed to "fully release the associated Limited Guaranties granted to KeyBank, the Personal Guaranty's [sic] granted to SELCO Service Corporation, and the Personal Guaranty's [sic] granted to Key Equipment Finance ("Personal Guarantees") and personal assets of Steven D. Young and Maria Young ("Young")."  Dkt. 61-2.  Western also agreed to cease a foreclosure proceeding that KeyBank had initiated, pay Steve Young's income taxes that resulted from the settlement, pay Steve Young one million dollars, and transfer back a twenty-five percent interest in the Oust Litigation.

It is undisputed that in August of 2008, Western turned over documents to the Department of Justice for the Oust Litigation. In the documents provided by Western, there was a copy of the 2006 Release of Nature's Best and Roy Young. It was Tippett's responsibility to compile the documents in response to the discovery request. Tippett Depo, Dkt. 142-1, p.6, (99:16-25; 100:1 – 8).

On June 29, 2010, Western's attorney did a UCC search and determined KeyBank had terminated its security interest in Nature's Best's interest in the Oust Proceeds in 2006.  This information was communicated to Tippett and Tippett testified in his deposition that he assumed the UCC filing was in error. Tippett Depo, Dkt. 57-4, p. 7 (181:8-25; 182:1-8)**.** There is no evidence Tippett performed any due diligence regarding whether or not the lien termination was in error. On June 30, 2010, Tippett inquired of Bean of KeyBank whether Nature's Best interest in the Oust Proceeds would continue to be included and Bean indicated that was his understanding. Tippett did not disclose to

7

Bean that he had a copy of the UCC lien termination or ask Bean about the status of UCC lien termination he was aware of. Tippett Depo, Dkt. 57-4, p.7 (181:19-24).

Tippett stated in his deposition the first time he became aware of the 2006 Release of Nature's Best was in meetings with Roy Young in November-December of 2011 and was provided a copy by Roy Young in January of 2012. Tippett Depo, Dkt. 57-4, p. 4 (52:2-18).

In late 2011, the Youngs and Nature's Best settled the Oust Litigation with DuPont. Western received approximately $24.8 million of the Oust Proceeds. Western also negotiated with the Youngs and Nature's Best an agreement under which Western took $5.5 million of a settlement in a legal malpractice suit between the Youngs' and Nature's Best and their attorneys in the Oust Litigation. As a result of the 2006 Release, however, Western alleges that Nature's Best improperly received approximately $4.5 million.

**STANDARD OF REVIEW**

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Crim. P. 56(a). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). When the non-moving party bears the burden of proof at trial, the moving

8

party may carry its initial burden by "produc[ing] evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, . . . [by showing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). "Once the moving party carries its initial burden, the adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but must provide affidavits or other sources of evidence that set forth specific facts showing that there is a genuine issue for trial." *Deveraux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc) (internal quotation marks omitted).       On summary judgment, all disputed facts and reasonable inferences must be construed in favor of the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment—where both parties essentially assert that there are no material factual disputes—does not vitiate the Court's responsibility to determine whether disputes as to material fact are present. *Id.*

9

# DISCUSSION

This case requires the Court's consideration and interpretation of numerous transactions between multiple entities and individuals over many years and the impact of interests in a tort claim and a legal malpractice claim. It is a lesson in the confusion that can result from inartful drafting of agreements by lawyers and non-lawyers, insufficient due diligence, the failure of sophisticated parties to adequately review documents prior to execution, and trying to interpret contracts years after the contracts were signed and other events have unfolded.  The Court will do its best to apply to the law to the undisputed facts presented.

1.      *Statute of Limitations on Contract Claims*

The Court will begin with KeyBank's Second Motion for Summary Judgment as its resolution could impact whether other issues need to be decided by the Court. KeyBank moves for dismissal of all the contract claims based on a statute of limitations defense. KeyBank argues that any breach of warranties or misrepresentations in the LSA are subject to a 5 year statute of limitation from the date the LSA was executed. Western argues the Amendment to the LSA renewed the statute of limitation for all warranties contained in the LSA. The Court finds the contract claims are subject to a five year statute of limitations and are time barred.

It is undisputed that the LSA closed on May 23, 2007.  Under Idaho law, a claim for breach of contract must be filed within five years. Idaho Code § 5-216. A cause of

action for breach of representations and warranties accrues at closing. *See Ace Sec. Corp. v. DB Structured Products, Inc.*, 112 A.D. 3d 522 (N.Y. 2013). Western filed its Complaint in state court on April 9, 2013. Therefore, the Complaint was filed *after* the applicable statute of limitations had run by approximately 11 months.

Western argues the Amendment of the LSA executed on August 3, 2010 renewed and restarted the statute of limitations regarding all warranties and representations made in the original LSA and therefore, the April 9, 2013 filing of the Complaint is timely filed. This argument distorts the facts of this case and the law. First, the Amendment to the LSA speaks for itself. Dkt. 146-2, Exhibit B. It is unambiguous. The purpose of the amendment was to change Western's obligation to pay KeyBank the Deferred Balance of the purchase price (defined as 50% of the Oust Proceeds Western may receive the future when the Oust Litigation was resolved) to instead pay a fixed sum certain amount of $1.75 million and eliminate the Deferred Balance as discussed in the LSA. The Amendment did not change any other terms of the LSA.

It is undisputed by the parties that the sum certain amount was negotiated by parties at arm length based on their estimations of the value of the Oust Litigation.  It is also admitted by Western's Tippett in his deposition that the only impact of the amendment was to change the purchase price. Tippett Depo., Dkt. 57-4, p. 6 (177:20-24).

It is true that in the Recitals section of the two and half page amendment document, it states: "[a] copy of the Loan Sale Agreement is annexed hereto and incorporated herein for greater certainty." Dkt. 146-2. The Court does not find that

11

attaching a copy of the LSA to the amendment created an express obligation for KeyBank to extend all warranties and representations in the original LSA to the amendment therefore starting the five year contract statute of limitations again on the LSA. The purpose of the amendment was to change the purchase price, not to extend the warranties and representations of the LSA. The LSA was referenced and attached as it was the LSA (not the amendment) that set forth the Deferred Balance term which was being modified by the parties in the amendment. Western's argument the amendment was a broad renewal of all warranties and representations of the LSA is not supported by the unambiguous language of the amendment nor the testimony of the purpose of the amendment by Western's Vice-President Tim Tippett.

Further, the Court finds Western's legal analysis regarding the effect of any acknowledgement is misplaced. The Court agrees under Idaho law (or Washington law as Western cites), a debtor's acknowledgement of a debt and promise to pay in writing and signed by the party can extend the statute of limitations by creating a new promise to pay a debt. Idaho Code § 5-238 and *Mahas v. Kasiska*, 276 P. 315 (Idaho 1929); *Fetty v. Wenger*, 36 P.3d 1123 (Wash. App. 2001). This exception does not apply to the facts of this case. KeyBank was not acknowledging a debt it owed to Western and agreeing to pay it in the amendment. KeyBank's annexation and incorporation of the LSA was for clarity and in no way can the reference to the LSA in the recitals section of the amendment be interpreted to mean KeyBank was expressly agreeing to extending the statute of limitations for all warranties and representations made in the LSA.

12

Even using the law regarding a debtor's acknowledgement in writing and agreement to pay by analogy to the amendment in this case, the facts are insufficient as a matter of law to be a re-acknowledgement of the warranties and representations under the LSA. "A mere reference to the debt, without an express or implied promise to pay it, is not sufficient to prevent the running of the statute." *Mahas* at 317.  The Amendment to the LSA merely referenced the LSA; it did not expressly state all obligations in the LSA were renewed.

"The only non-statutory bar to a statute of limitations defense is the doctrine of equitable estoppel." *J.R. Simplot Co. v. Chemetics Int'l, Inc.*, 887 P.2d 1039, 1041-42 (Idaho 1994) (citation omitted). The Court agrees with KeyBank that Western cannot invoke equitable estoppel to revive an untimely claim under the facts of this case.  The elements for equitable estoppel are:

> (1) a false representation or concealment of a material fact with actual or construction knowledge of the truth;
> (2) that the party asserting the estoppel did not know or could not discover the truth;
> (3) that the false representation or concealment was made with the intent that it be relied upon; and
> (4) that the person whom the representation was made, or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice.

*McCormack v. Everest Nat. Ins. Co.*, No. 1:13-CV-00318-EJL, 2015 WL 409312, at *15 (D. Idaho Jan. 29, 2015) (quoting *Chemetics Int'l, Inc.* at 1041-42). Here, the undisputed facts establish that Western cannot establish the second element as Western was aware

that Nature's Best had been released from KeyBank's security interest well before the statute of limitations to file the contract claim expired. Tippett admitted in his deposition he had been advised by Steve Young (via email or oral communications) that Roy Young owned Nature's Best and that KeyBank had released Roy Young and Nature's Best from the KeyBank security interest in 2006 or 2007, a copy of the 2006 Release was turned over by Western to the Department of Justice investigating the Oust Litigation in 2008, counsel for Western was aware the termination of the UCC lien in June of 2010 (before signing the Amendment of the LSA) and Tippett learned again of the 2006 Release in December of 2011 when negotiating with Roy Young over the Oust Proceeds. These undisputed disclosures defeat Western's attempt at claiming it did not know or could not have discovered the misrepresentation and timely filed its Complaint within five years of the closing on the LSA.

The Court also rejects Western's argument that there was any "reconveyance" of 50% of KeyBank's security interest in the Oust Proceeds when the LSA was executed and the amendment was to purchase the "reconveyed" 50% interest of KeyBank to Western. This interpretation is inconsistent with the express terms of the LSA and the amendment. The LSA is clear that Western was purchasing 100% of KeyBank's security interest in the Oust Proceeds, but deferring the payment for such interest until the Oust Proceeds were received at which point KeyBank would receive 50% of the Oust Proceeds from Western. As discussed earlier, the amendment simply changed the purchase price from a deferred balance owed to a lump sum payment. The amendment did not change

14

the percentage of the security interest in the Oust Proceeds Western had purchased under the LSA such that it implied a renewal of all warranties and representations in the LSA. Tippett Depo, Dkt. 62, p.54 (170:10-18).

For all these reasons, the Court finds the contract claims relating to breach of warranties and misrepresentations must be dismissed as a matter of law. Further, the contract claim for breach of the implied covenant of good faith and fair dealing must also be dismissed as it is a contractual obligation governed by the same five year statute of limitations. Based on this ruling, the Court need not determine whether or not the disclaimer of the warranties in Oust Assignment survives and Western's and KeyBank's cross motions for partial summary judgment on this issue are denied as moot.

*2. Fraud Claim*

Western's fraud claim is clearly intertwined with its breach of contract claim regarding warranties and representations. To the extent that the fraud claim is part of the contract claim on the LSA, such claim is dismissed. However, the Court acknowledges that Western's fraud claim can also be considered an independent cause of action from the breach of warranties and misrepresentation contract claim. Therefore, the Court will address the summary judgment motion on this claim.

The Court also finds a statute of limitations issue on part of this claim after analyzing the statute of limitations argument on the contract claim. Because the affirmative defense of statute of limitation was raised in KeyBank's Answer and the

parties have presented adequate facts in the record from the summary judgment briefing on the fraud claim to allow the Court to address this issue, the Court makes the following findings.

The statute of limitations for a fraud claim is three years as set forth in Idaho Code § 5-218(4). However, a fraud claim based on a misrepresentation in a contract does not accrue from the date of closing on the contract. A fraud cause of action "cannot be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." *Id.* "However, actual knowledge of the fraud will be inferred if the allegedly aggrieved party could have discovered it by the exercise of due diligence." *Nancy Lee Mines, Inc. v. Harrison*, 511 P.2d 828, 829 (Idaho 1973). "Ordinarily, what constitutes reasonable diligence to discover fraud so as to affect the time when the statute of limitations begins to run is a question of fact for the jury. *Full Circle, Inc. v. Scheiling*, 701 P.2d 710, 258 (Idaho Ct. App. 1985). In this case, the parties have elected a bench trial, so the Court will be the fact finder.

Here, since the Complaint was filed April 9, 2013, the alleged fraud of KeyBank misrepresenting its security interest in Nature's Best in the LSA had to have been first discovered by the exercise of reasonable diligence by Western sometime *after* April 9, 2010 for the claim to be within the statute of limitations

Tippett testified in his deposition that he was aware in 2006 or 2007 from communications with Steve Young that Roy Young owned Nature's Best (Steve Young owned the farm assets) and that KeyBank had released Roy Young and Nature's Best as

16

collateral for the security interests in the Oust Litigation. Additionally, Western had a copy of the 2006 Release in its files in 2008 when Western turned over discovery to the Department of Justice  investigating the Oust Litigation and such discovery included records kept in the normal course of Western's business.  Moreover, Tippett admits he was the Western employee responsible for collecting the materials to be turned over in 2008.

While Tippett claims he was not "aware" of the actual 2006 Release document until December 2011 or January 2012 when negotiating with Roy Young, his own testimony and copies of emails establishes he had "knowledge of" the release of Roy Young and Nature's Best from KeyBank's collateralization as early as 2006 or 2007. Tippett, as Vice President of Western, was in charge of LSA negotiations as well as the negotiations on the Amendment to the LSA with KeyBank and the negotiations with Steve Young. Western was in the business of purchasing non-performing loans at a discount from creditors and Tippett was aware of how to check the status of publicly filed UCC documents regarding loans and security interests his company was buying. Western employed attorneys to assist in the purchase of loans. Tippett worked closely with Western's counsel reviewing the LSA documents prior to executing the same, he received the list of UCC Financing Statements being transferred to Western from KeyBank and elected not to complete any due diligence regarding the financing statements to determine if any of such liens had been terminated even though he testified he knew how to search for such information and had learned of Roy Young and Nature's

17

Best releases from Steve Young prior to closing on the LSA. Tippett specifically admitted to receiving emails from Steve Young that should have a put sophisticated business person on notice of the 2006 Release. Moreover, these emails were also sent to another officer of Western, Frank Tiegs, who also declined to conduct obvious due diligence regarding the security interest in Nature's Best's interests in the Oust Litigation.

Western's explanation of the effect of the emails does little to support its argument that the emails did *not* provide notice of the 2006 Release. Western argues that the emails were irrelevant in its eyes because "Nature's Best and Roy Young . . . were not Borrowers under the KeyBank loans." *Dkt.* 74 at 7, 8. That statement appears to be wrong. Nature's Best was a signatory to the 2005 Security Agreement. That document describes a note entered into between Nature's Best and KeyBank on April 26, 2005. Dkt. 75-9 at 2. Furthermore, Roy Young and Nature's Best are referenced in the 2006 Release as "Borrowers indebted to [KeyBank] in the principal amount of" $15.8 million. *Dkt.* 75-13 at 2.

Western also claims it had no need to check the status of the UCC financing statements as KeyBank warranted they were all good. This does not relieve Western of good faith and fair dealing when it had at least some knowledge that Nature's Best was released from collateralization under the KeyBank loans in 2006. If anything, this excuse appears to fly in the face of Western's representation it had completed all necessary and appropriate due diligence for a transaction worth millions of dollars.

Based on the emails and the admissions of Tiegs and Tippett in their depositions, any fraudulent misrepresentation could or should have been discovered in the exercise of reasonable diligence at some time prior to the closing on the LSA or at the very latest by 2008 when a copy of the 2006 Release was turned over by Western to the Department of Justice. The emails and statements by Steve Young alone establish sufficient suspicion on the status the security interest held by KeyBank regarding Roy Young and Nature's Best. The steps to check online the status of a UCC financing statement were known and not completed by Tippett. All the information available to Western prior to April 9, 2010, constituted sufficient circumstantial evidence from which Western knew or should have been able to know through the exercise of reasonable diligence there was a misrepresentation or fraudulent warranty in the LSA. *See DBSI/TRI v. Bender*, 948 P.2d 151, 163 (Idaho 1997). Western should not be allowed to turn a blind eye and not complete reasonable diligence based on the facts it was aware of as early as 2006. Therefore, any claim of fraud as to the LSA is barred by the statute of limitations.

The statute of limitations analysis is slightly different as to the alleged fraudulent misstatement by KeyBank's Bean in an email to Tippett on June 30, 2010 that Nature's Best's interest to the Oust proceeds would be included under the Amendment. Third Amended Complaint, Dkt. 41, ¶ 79. This statement would be within the three year statute of limitations for fraud and the merits of the motion for summary judgment on this issue must be addressed by the Court.

"The nine elements of a fraud claim are: (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury." *April Beguesse, Inc. v. Rammell*, 328 P.3d 480, 489 (Idaho 2014). Furthermore, "the mere failure to perform a promise or an agreement to do something in the future" cannot be fraud unless "the speaker made the promise without any intent to keep it," or "the promise was accompanied by statements of existing fact which show the promisor's ability to perform the promise and those statements were false." *Gillespie v. Mountain Park Estates, LLC*, 132 P.3d 428, 431 (Idaho 2006). Western's fraud claim is based upon the warranties that KeyBank made in the LSA and a representation made by a KeyBank employee prior to the Amendment to the LSA being executed. It is Western's burden to prove all nine elements by clear and convincing evidence. *Thomas v. Medical Center Physicians, P.A.*, 61 P.3d 557, 564 (Idaho 2002). For purposes of summary judgment, the Court's inquiry is whether a reasonable factfinder could conclude the plaintiff has shown fraud by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

It is undisputed that KeyBank mistakenly included the security interest in Nature's Best's interest in the Oust Litigation in the security interests it said it was providing to Western under the LSA. Bean knew or should have known that the security interest in Nature's Best had been released by KeyBank since he was the signatory on behalf of

KeyBank for the 2006 Release, the LSA and the Amendment to the LSA. For purposes of the motion for summary judgment, the Court will assume the misstatement was material to the transactions.

In this case, it is disputed whether Western was ignorant of the falsity of the statement and relied on the statement. Even assuming Western's ignorance, the Court finds no reasonable fact finder could find by clear and convincing evidence that Western justifiably relied on the statement.

Fraudulent misrepresentation requires that the recipient's reliance on the misrepresentation be justified. *Stewart Title of Idaho, Inc. v. Nampa Land Title Co.*, 715 P.2d 1000, 1002 (Idaho 1986). As to the Amendment to the LSA, Western did not justifiably rely on the email statement by Bean since Western (through Tippett) was aware the lien had been terminated as to Nature's Best and failed to disclose this information to Bean, so that Bean could corrected his misstatement. Instead, Western proceeded over a month later with signing the Amendment to the LSA knowing KeyBank did not have a security interest in Nature's Best's interest in the Oust Litigation.

It is undisputed by Western, that on June 29, 2010, Western's prior counsel downloaded a copy of the UCC lien termination covering Nature's Best's interests in the Oust Litigation proceeds and provided it to Western. Before Western signed the Amendment to the LSA in August of 2010, Tippett knew from his attorney that the Nature's Best UCC lien had been terminated in 2006. Therefore, there is no way for Western to have reasonably or justifiably relied on the email statement by Bean. Western

21

knew KeyBank no longer had an interest in Nature's Best since at least June 19, 2006 when the 2006 lien termination had been publicly filed. Tippett's testimony that he thought the UCC lien termination was filed in error without conducting any due diligence regarding the lien termination eliminates any reliance on the email being justified.

Additionally, the Court finds Bean's email statement "I believe that it anticipates all related entities and Nature's Best would be included" was his opinion and was not included as an additional term of the Amendment to the LSA nor was the email incorporated by reference in the Amendment to the LSA. It is unclear if the email comment by Bean is even related to the ultimate amendment executed over a month later by the parties or some other alternative the parties were discussing in June. The Court finds the misrepresentation  in the email is Bean's opinion and Western's reliance on the opinion without including it in the Amendment is not justified. *Stewart Title* at 1002 citing Restatement (Second) of Torts § 542; *Nelson v. Hoff*, 218 P.2d 345, 340 (Idaho 1950).

This has to be the case because the purpose of the LSA was not to change the security interests being acquired, but was to change the Deferred Balance of the purchase price due from a percentage of the Oust Proceeds to a sum certain. The Court finds as a matter of law the fraud claim related to the Amendment to the LSA fails as Plaintiff cannot prove by clear and convincing evidence that it justifiably relied on the email statement by Bean.

For these reasons, the Court finds any fraud claim must also be dismissed as a matter of law on the basis of the contract claims being dismissed, the fraud claim being outside the statute of limitations or Western's failure to justifiably rely on the fraudulent misrepresentations regarding Nature's Best.

*3.     Damages and Motion to Strike*

Having determined the contractual claims are barred by the statute of limitations and the fraud claims either barred by the statute of limitations or Plaintiff has failed to establish facts that a reasonable fact finder could use to support a finding of justifiable reliance by clear and convincing evidence, the Court need not rule on Western's motion for summary judgment regarding whether it held an ownership interest or a security interest. Moreover, the Court need not rule upon the motion in limine to strike KeyBank's damages expert. These motions will be denied as being moot.

**ORDER**

1.     Plaintiff's Motion for Partial Summary Judgment (Dkt. 57) is **DENIED AS MOOT**.

2.     Defendants' Motion for Summary Judgment (Dkt. 76) is **GRANTED IN PART AND DENIED AS MOOT IN PART** consistent with this Memorandum Decision and Order.

23

3.      Plaintiff's Motion for Partial Summary Judgment: Ownership Interest (Dkt. 75) is

**DENIED AS MOOT**.

4.      Plaintiff's Motion in Limine (Dkt. 79) is **DENIED AS MOOT**.

5.      Defendants' Second Motion for Summary Judgment on Statute of Limitations

(Dkt. 140) is **GRANTED.**

6.      Defendants shall submit to the Court a proposed judgment consistent with this

Memorandum Decision and Order within ten (10) days of the date of this Order.

DATED: September 22, 2015

Edward J. Lodge
United States District Judge